IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


MAX ZWEIZIG,

                Plaintiff,

      v.

TIMOTHY C. ROTE, et al.,

            Defendants.

No. 3:14-cv-00406-HZ

FINDINGS OF FACT &
CONCLUSIONS OF LAW


Linda L. Marshall
PMB 408
3 Monroe Parkway, Suite P
Lake Oswego, OR 97035

      Attorney for Plaintiff


Timothy C. Rote
24790 SW Big Fir Road
West Linn, OR 97068

      Pro Se Defendant

HERNÁNDEZ, District Judge:

This case arises out of Plaintiff Max Zweizig's inability to collect a judgment against Defendant Northwest Direct Teleservices.[1] Plaintiff brings claims under Oregon's Uniform Fraudulent Transfer Act (UFTA) against Defendants Timothy Rote, Northwest Direct Teleservices, Inc., Northwest Direct Marketing of Oregon, Inc., Northwest Direct Marketing, Inc., Northwest Direct of Iowa, Inc., Northwest Direct Marketing, Inc. (Delaware), and Rote Enterprises, LLC. An Order of Default was entered against all Defendants except Defendant Rote on February 20, 2017.

Plaintiff alleges that Defendants Rote, Northwest Direct Teleservices, Inc. ("NDT"), and Northwest Direct Marketing, Inc. ("NDM") violated ORS 95.240 when Defendant NDT granted Defendant NDM a security interest in NDT's assets on May 29, 2012, four days after Plaintiff's counsel mailed a Notice of Demand to Pay Judgment to Defendants Rote and NDT. Plaintiff also alleges that the May 29, 2012 security interest violated ORS 95.230 because the it was granted with the actual intent to defraud Plaintiff and hinder his ability to enforce the judgment. Similarly, Plaintiff alleges that the 2009 Reorganization of the Defendants was done with the actual intent to defraud Plaintiff and hinder his ability to enforce the judgment. Separately, Plaintiff brings veil piercing claims against Defendants Rote and Northwest Direct Marketing. Plaintiff also brought a claim for civil conspiracy against Defendant Rote that was dismissed by the Court at the pretrial conference.

The Court conducted a two-day bench trial on the remaining claims against Defendant Rote on May 7 and 8, 2018. The following are the Court's Findings of Fact and Conclusions of

---

[1] This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1): the parties are completely diverse, and the amount in controversy is at least $75,375. Second Am. Compl., ECF 96.

Law from that trial. *See* Fed. R. Civ. P. 52(a). As explained below, the Court finds in favor of

Defendant Rote on all of Plaintiff's claims. Therefore, Defendant Rote is not liable to Plaintiff.

## EVIDENTIARY RULINGS

Currently pending before the Court are various evidentiary objections and motions in

limine filed prior to trial. Plaintiff objected to Defendant's Exhibit 532, a 2011 declaration from

Defendant Rote filed in the case *Northwest Direct Teleservices, Inc. v. Zweizig,* 3:11-cv-00910-

PK, arguing that it is inadmissible hearsay and amounts to re-litigation of the arbitration. Plaintiff

also objected to Defendant's Exhibit 530, a UCC filing between Wells Fargo Bank and

Northwest Direct Marketing, Inc., arguing that it is irrelevant to this case. *See* Pl. Obj. Def. Ex. 3,

ECF 254. The Court overrules both objections. As to Exhibit 532, the Court finds—as Plaintiff

concedes—that the exhibit is admissible when used to show notice to Plaintiff of the

reorganization for statute of limitations purposes. *Id.* Regarding Exhibit 530, the Court finds that

the exhibit is relevant to whether the 2012 financing statement constitutes a fraudulent transfer of

assets in violation of ORS 95.230.

To the extent that other objections were made, the Court declines to address them as they

have no bearing on the outcome of this case.

## FINDINGS OF FACT

Defendant Timothy Rote testified that he was the chair and sole member of the board of

directors, recording secretary, president, registered agent, and representative CEO of all the

entities in the "Northwest Group." Defendant Rote testified that he either directly or indirectly

owned all of the Northwest Group, had absolute control over the entities, and made decisions for

the benefit of the Group. The Northwest Group is comprised of NDT (the parent company prior

to July 1, 2009), NDM (the parent company after July 1, 2009, formerly known as Northwest

Direct of Eugene), Northwest Direct of Iowa (the operating call center in Iowa), Northwest

Direct Marketing of Oregon (the operating call center in Beaverton, OR), and Northwest Direct

Marketing (Delaware). In addition, Defendant Rote was an employee of NDT, earning an annual

salary of $180,000.  He was also the managing agent of Rote Enterprises LLC, a holding

company for the Northwest Group. Tanya Rote, Defendant Rote's wife, is a former banker and

was employed by NDT as controller of Northwest Group. In that capacity, she performed various

financial and bookkeeping functions.

Plaintiff Max Zweizig testified that he was formerly employed by NDT as its IT Director.

After Plaintiff was terminated, Defendant Rote, on behalf of NDT, filed claims in arbitration

against Plaintiff in 2006. Plaintiff brought counterclaims for wrongful termination against both

NDT and Defendant Rote, but Defendant Rote was dismissed as a party to the arbitration in 2007

or 2008. The evidentiary hearings in the arbitration were held in 2010.

On March 31, 2011, Plaintiff was awarded monetary damages on one of his

counterclaims in the amount of $75,375. Def. Ex. 505. Defendant NDT was also awarded

monetary damages in the amount of $4,316.94. Def. Ex. 505.  The District Court for the District

of Oregon affirmed the arbitration award and entered judgment on February 14, 2012. Plaintiff

testified that NDT has not yet paid the judgment.

I.      **Structure of the Affiliated Group of Companies Prior to the Reorganization**

Defendant Rote testified that in 2006, NDT was the parent company of the Northwest

Group. The subsidiaries of the Northwest Group at that time were Northwest Direct of Iowa (the

operating call center in Iowa), Northwest Direct of Eugene (the operating call center in Eugene),

and Northwest Direct Marketing (Delaware) (an entity that held a few client contracts but was

not otherwise engaged in meaningful business). In 2006, Defendant testified that either he or

Rote Enterprises LLC owned 100% of the stock in NDT. Rote Enterprises performed no services but held assets in the form of NDT's stock. Defendant Rote owned Rote Enterprises along with NDT and Rote & Company PC, which owned one-tenth of one percent of Rote Enterprises.

As the parent company, NDT provided common management services to benefit the subsidiaries, including legal, finance, marketing, sales, customer, client, and IT services. The costs for NDT's services were charged down to the subsidiaries. NDT also served as the treasurer for the Group and held a zero-balance ("ZBA") master account, which functioned as the Northwest Group's consolidated cash account. Each entity maintained separate ZBA general checking and payroll accounts. Money would move between the subsidiaries' accounts and the master account at the end of each day to cover amounts paid out of the subsidiary accounts and zero out any money deposited into the accounts. Defendant Rote and Tanya Rote testified that they maintained detailed accounting of intercompany accounts representing the amounts owed between the subsidiary entities and parent company because of these transfers.

In 2006, Defendant Rote testified that NDT had the following assets: stock in the subsidiaries, one million dollars' worth of technology, and some accounts receivable. Defendant Rote testified that the group had anywhere from six to ten contracts per client at any given time. The contracts were the Group's sole source of income because it did not perform any services without a contract. Defendant Rote testified that the gross annual revenue for the Northwest Group generated from these contracts was approximately $5,000,000. Its net income was around $100,000. But Defendant Rote testified that the contracts had no outside or predictable value even though they produced revenue for the company. The contracts could not be sold or transferred to an outside party and many were terminated by clients in breach of the termination provisions. NDT held some client contracts in its name, but Defendant Rote testified that NDT

only retained 10% of the revenue generated from these contracts to cover the administrative services rendered to the subsidiaries. The remaining 90% went to the entity responsible for rendering services to the client under the contract.

## II.    2009 Reorganization

At the July 4, 2008 Board of Directors Meeting for NDT, the Board of Directors decided to reorganize the Northwest Group on July 1, 2009, to make NDM the parent of the Northwest Group and NDT a subsidiary of NDM. Pl. Ex. 2. Per the board minutes, NDM—instead of NDT and NDM Delaware—would begin to issue client and vendor contracts. Pl. Ex. 2. The minutes also reflect NDT's intent to continue to maintain the IT equipment and "focus on developing a hosting business, factoring business, and pursue the acquisition of call center software that it can package, market and sell." Pl. Ex. 2. Defendant Rote also testified that he could not recall whether the minutes were produced in discovery at the arbitration but that it was likely he felt there were nonresponsive.

On July 1, 2009, NDT entered into a reorganization and distribution agreement to contribute and distribute assets between entities as resolved at the 2008 Board of Directors meeting. Def. Ex. 529; *see also* Pl. Ex. 1. The agreement was unanimously adopted by the Board of Directors, which was comprised solely of Defendant Rote. Per the reorganization agreement, NDT—the parent organization at the time—desired to separate its businesses into two independent companies so that NDT could "develop a hosting and IT consulting business, as well as explore leasing of equipment, licensing and factoring in the call center space." Def. Ex. 529. Defendant Rote testified that NDT wanted to separate the technology side of its business from the services side of its business because the technology business was high risk and high reward. Specifically, Defendant Rote testified that the only way to protect the Northwest Group

from cybercrime and the risks and inefficiencies of owning technology was to separate the technology into its own entity. Tanya Rote also testified that it was her opinion that the technology was transferred away from the parent company because they were concerned the technology was risky enough to ruin the entire group. The technology could not be transferred to another entity away from NDT because the licenses were non-transferable. NDT therefore became the technology-owning entity with the hope that NDT would grow into a standalone business that was both profitable and unique. Defendant Rote testified that he hoped NDT could eventually contract with outside businesses and use the technology as an additional revenue source. At the time, Defendant Rote testified that they were having difficulties with the licenses and technology supplied to NDT by a business called TouchStar.

The reorganization proceeded in six steps. First, NDT contributed all its stock in Northwest Direct Marketing of Oregon and Northwest Direct of Iowa to Northwest Direct of Eugene. Next, Northwest Direct of Eugene was to change its name to NDM. Third, NDM Delaware transferred its rights under the various service contracts to NDM and liquidated. Fourth, NDT distributed to its shareholder Rote Enterprises 100% of the stock of NDM. Fifth, Rote Enterprises contributed 100% of the stock of NDT to NDM, making NDT a subsidiary member of the Northwest Group. *See* Def. Ex. 529. Defendant testified that each of these steps was carried out over a period of time.

As a result of this agreement, NDT became a subsidiary of NDM, and NDM became the parent of the Northwest Group. According to Defendant, NDT retained the opportunity to derive income from the subsidiaries in the amount of $7,500 per month for the use of the technology. It transferred the management services and its entitlement to 10% of the revenues from the subsidiaries to NDM as well as the ZBA master account, all customer contracts except for

Leapfrog Online, and stock held in the subsidiaries. The basis for the stock in all three entities amounted to just over $100,000. Def. Ex. 529.

Defendant Rote also testified that as a result of the transfer NDT retained the cash and commercial debt that it had accrued as well as the equipment. NDT began carrying the ongoing litigation with TouchStar as an asset on its balance sheet and retained all debts associated with the TouchStar system. Def. Ex. 527, Pl. Ex. 3, 4. NDT was compensated by other members of the group in an amount of $7,500 per month for the use of the technology. Pl. Ex. 4. In exchange for the stock that was transferred to NDM, Defendant Rote testified that NDM assumed the intercompany obligations that NDT owed to the other members of the Northwest Group. At the time, Defendant testified that the subsidiaries were owed money from the parent. This is supported by the 2009 reorganization spreadsheet, which shows that NDT owed $361,973 to the other entities in the Northwest Group prior to the reorganization and was owed $226,515 after the reorganization. Def. Ex. 528. Prior to the reorganization, the consolidated balance sheet shows that NDT had $1,069,835 in assets and $355,743 in liabilities. Def. Ex. 527. After, NDT's assets remained at $1,069,108, and its liabilities were $350,319. Def. Ex. 528. NDT continued to carry $160,069 in cash, $9,027 in accounts receivable, and $27,808 in a note after the reorganization. Def. Ex. 528. A year later, the consolidated balance sheet shows that NDT's total assets amounted to $905,209 and its total liabilities were $215,411. In 2011, NDT's total assets were $224,471 and its total liabilities were $118,680. Def. Ex. 527. According to Defendant Rote, the balance sheets largely reflected historical basis—rather than the fair market value—for the Northwest Group's non-cash and non-accounts receivable assets.

After the reorganization, consolidated income tax returns were filed in NDM's name. The consolidated return for the period of July 1, 2009, to June 30, 2010, shows a gain of over

$200,000 in cash in the Northwest Group's account that was owned by varying entities in the Northwest Group according to the testimony of Defendant Rote. The Northwest Group had gross sales amounting to $6,159,000.

Defendant Rote acknowledged that NDT could have satisfied the judgment in 2011. Defendant Rote testified that he made a business decision that it was better to use the Group's finite resources to pursue a potential damages award of $1.6 million against TouchStar than pay the judgment owed to Plaintiff. And while Defendant Rote testified that he had an open line of credit for up to one million dollars with NDM, he explained that he did not loan money to NDM or NDT to satisfy the judgment because, as a rule, he only loaned money to the entities when he felt that there was an opportunity for substantial profit from the investment.

## III.    Notice of the 2009 Reorganization

Defendant Rote testified that he did not disclose the reorganization in the arbitration with Plaintiff because it was a private matter. Defendant Rote also admitted to testifying under oath at that proceeding that NDT was the parent company of the Northwest Group over a year after the reorganization had occurred.

However, in support of his attempt to vacate the arbitration award in federal court, Defendant Rote filed a declaration on August 15, 2011, in which he states that "NDT is a subsidiary of an affiliated group of companies, the operating entities of which predominantly provide inbound customer service and sales support for a variety of customers." Def. Ex. 532. Defendant Rote testified that this paragraph of the agreement discloses that NDT is a subsidiary—rather than the parent—of the affiliated group of companies. According to Defendant, this was the first time he felt an obligation to disclose the reorganization to Plaintiff.

Plaintiff testified that he had no notice of the reorganization until a few years prior to the trial. In a letter to Plaintiff's counsel dated June 29, 2015, Defendants' counsel sent a copy of the 2009 reorganization agreement and tax return. Pl. Ex. 12. Defendant Rote testified that he believed that the tax return had not been provided to Plaintiff or his counsel prior to that time.

## IV.    2012 Financing Statement

Plaintiff sent a demand to pay the judgment from the arbitration on May 25, 2012. Pl. Ex. 7. When asked if he had received the letter, Defendant testified that he had no recollection of receiving it but that he was aware at that time that Judge Brown had already entered a judgment in favor of Plaintiff.

On May 29, 2012, the Secretary of State received a UCC financing statement prepared by Defendant Rote. The financing statement listed NDT as the debtor and NDM as the creditor. Def. Ex. 531. It also listed all accounts, commercial contracts and tort claims, instruments, promissory notes, investment property, letters of credit, inventory, equipment goods, tools, fixtures, and software, among other things, as the collateral. Def. Ex. 7.  The June 30, 2012 balance sheet shows that only a month after the filing of the financing statement, NDT's assets were $40,461 and its liabilities were $17,844, not including the judgment owed to Plaintiff. Def. Ex. 528.

Defendant Rote testified that he filed the financing statement to protect Wells Fargo Bank's interest in the assets of NDM and NDT. Defendant Rote explained that NDM had loaned NDT money, principally from the $600,000 line of credit NDM had with Wells Fargo Bank, to finance the TouchStar litigation. Defendant Rote testified that he had personally guaranteed the loan between NDM and Wells Fargo Bank and did not think Wells Fargo's UCC filing was adequate to allow Wells Fargo Bank to reach NDM's accounts receivable and the subsidiaries assets. Specifically, Wells Fargo's February 3, 2012 financing statement did not contain any

reference to the subsidiaries' assets, though it referred to most of NDM's assets, including all accounts. Def. Ex. 530. Defendant Rote explained that he prepared the UCC financing statement so that the money loaned from NDM to NDT to finance the litigation with TouchStar would be secured if Wells Fargo Bank went to collect the accounts receivable against NDM. Per Defendant Rote, the financing statements represented a stacking of obligations so they could assure Wells Fargo Bank that they were being good stewards with the money that they had been loaned.

## CONCLUSIONS OF LAW

**II.     The 2009 Reorganization**

The Court finds that Plaintiff has not shown by a preponderance of the evidence that Defendant Rote fraudulently transferred assets in the 2009 Reorganization in violation of ORS 95.230. First, the Court finds that Plaintiff's claims under ORS 95.230 are barred by the applicable statute of limitations. Second, even if the claim under ORS 95.230(1)(a) is not barred, Plaintiff has not shown by a preponderance of the evidence that Defendant Rote's actual intent was to defraud or hinder Plaintiff's collection of the judgment with the reorganization of the Northwest Group.

**A.     Statute of Limitations**

ORS 95.280 provides the limitations period for claims arising under ORS Chapter 95. To bring a claim under ORS 95.230(1)(b), a plaintiff must file his action "within four years after the transfer was made or the obligation was incurred." ORS 95.280(2). The reorganization occurred on July 1, 2009, and this claim filed on March 11, 2014. As more than four years lapsed between the date of the reorganization and this suit, Plaintiff is barred by the statute of limitations from bringing claims related to the 2009 reorganization under ORS 95.230(1)(b).

To bring a claim under ORS 95.230(1)(a), a plaintiff must show that he filed his claim "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." ORS 95.280(1). Although Plaintiff testified that he did not discover the reorganization until a few years prior to the trial, the Court finds that Plaintiff was on notice of the reorganization with the filing of Defendant's 2011 declaration. The declaration provides "NDT is a subsidiary of an affiliated group of companies, the operating entities of which predominately provide inbound customer service and sales support for a variety of customers" and was filed to vacate the very award at issue in this case. Def. Ex. 532. This statement directly contradicts the statement Defendant made at the arbitration that NDT was the parent company of the Northwest Group. Thus, even if Plaintiff did not actually discover the reorganization until 2015, Plaintiff was notified of and reasonably could have discovered the reorganization with the filing of this declaration in 2011. Because the declaration giving Plaintiff notice of the reorganization was filed on August 15, 2011, more than one year prior to the filing of this lawsuit, Plaintiff's claim that the 2009 transfer was fraudulent is barred by the statute of limitations.

**B.     ORS 95.230(1)(a)**

Even assuming that Plaintiff could bring a claim under ORS 95.230(1)(a), the Court finds that Plaintiff has not shown by a preponderance of the evidence that the 2009 reorganization constitutes a fraudulent transfer. ORS 95.230(1)(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.

This section "calls for a case-by-case factual determination of whether a transfer was made" with such fradulent intent. *Morris v. Nance*, 132 Or. App. 216, 221 (1994).  ORS 95.230(2) provides a

list of non-exhaustive factors or "badges of fraud" that "allows the inference of actual intent to

be drawn from the presence of listed factors or other suspicious factual circumstances

surrounding the transfer," *Morris,* 132 Or. App. at 221:

> (1) In determining actual intent under subsection (1)(a) of this section, consideration
> may be given, among other factors, to whether:
>
> (a)      The transfer or obligation was to an insider;
> (b)      The debtor had retained possession or control of the property transferred
> after the transfer;
> (c)      The transfer or obligation was disclosed or concealed;
> (d)      Before the transfer was made or obligation was incurred, the debtor was
> sued or threatened with suit;
> (e)      The transfer was of substantially all the debtor's assets;
> (f)      The debtor had absconded;
> (g)      The debtor had removed or concealed assets;
> (h)      The value of the consideration received by the debtor was reasonably
> equivalent to the value of the asset transferred or the amount of the
> obligation incurred;
> (i)      The debtor was insolvent or became insolvent shortly after the transfer
> was made or the obligation was incurred;
> (j)      The transfer had occurred shortly before or shortly after a substantial debt
> was incurred; and
> (k)      The debtor had transferred the essential assets of the business to a lienor
> who had transferred the assets to an insider of the debtor.

*See* ORS § 95.2309(2). "The burden of persuasion remains on the plaintiff to show actual intent

by a preponderance of the evidence." *Morris*, 132 Or. App. at 223.

      In this case, Plaintiff has demonstrated the existence of certain badges of fraud with

regard to the 2009 transfer.  The transfer was made to insiders, namely the affiliated entities Rote

Enterprises and NDM. The transfer was concealed: Defendant did not disclose the reorganization

until 2011 because he felt it was a private matter. NDT was aware of Plaintiff's suit prior to the

reorganization because Plaintiff brought his counterclaims in the arbitration before the transfer

occurred.

      However, the evidence presented at trial does not otherwise demonstrate that Defendant

Rote intended to defraud Plaintiff in reorganizing the Northwest Group. First, NDT was not

rendered insolvent as a result of the transfer. Immediately before and after the transfer, NDT's liabilities were less than its assets. Debts to the other subsidiaries were transferred out of NDT to NDM. NDT retained significant assets of the corporation in the form of the technology. The subsidiaries were to pay NDT a monthly fee for the use of the technology. According to the consolidated balance sheets, NDT also remained solvent for at least two years following the transfer.

In addition, Defendant Rote credibly testified at the trial that the purpose of the reorganization was to separate the technology side of his business—which he viewed as high risk—from the management side of the business. Defendant Rote explained that the licenses for the technology were nontransferable, requiring the management business as opposed to the technology business to be transferred to a new entity. Defendant's goal was to grow the technology into its own profitable business. Both the documentary evidence and other testimony support Defendant's testimony. Tanya Rote also testified that in her opinion the technology was transferred away from the parent company because of the risk associated with the technology. The Reorganization Agreement and Board Minutes further demonstrate that the purpose of the reorganization was to develop and grow a technology-centered business. Based on this evidence, the Court concludes that Plaintiff has not shown by a preponderance of the evidence that the actual intent of Defendant Rote in this case was to defraud Plaintiff by reorganizing the Northwest Group.

## II.     The 2012 Financing Statement

The Court also finds that Plaintiff has not shown by a preponderance of the evidence that the filing of the 2012 UCC financing statement was fraudulent under ORS 95.230 and 95.240. First, Plaintiff's claims under ORS 95.240(2) are barred by the applicable statute of limitations.

Second, the Court finds that Plaintiff has not demonstrated that a transfer of assets occurred with the filing of the 2012 UCC financing statement. Third, even if the filing if the financing statement constitutes a transfer of assets, the Court finds that Plaintiff has failed to meet his burden to show both that NDT's actual intent was to defraud Plaintiff and that NDT did not receive reasonably equivalent value in exchange for the filing of the financing statement.

### A.      Statute of Limitations

To bring a claim under ORS 95.230(1)(a), the plaintiff must file his action "within four years after the transfer was made or the obligation was incurred, or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." ORS 95.280. Similarly, to bring a claim under ORS 95.230(1)(b) or 95.240(1), the plaintiff must file their action "within four years after the transfer was made or the obligation incurred." ORS 95.280(2). The financing statement was filed on May 29, 2012, which is less than two years from the March 11, 2014 filing date of this action. Accordingly, Plaintiff's claims under ORS 95.230 and 95.240(1) are not barred by the applicable statute of limitations.

To bring a claim under ORS 95.240(2), the plaintiff must file their claim "within one year after the transfer was made or the obligation was incurred." ORS 95.280(3). This action was filed on March 1, 2014, and the financing statement was filed on May 29, 2012. As more than one year lapsed between the filing of the financing statement and this action, Plaintiff is barred from bringing a claim under ORS 95.240(2).

### B.      Transfer of Assets

As a preliminary matter, the Court finds that Plaintiff has not proven by a preponderance of the evidence that a transfer occurred in 2012. To succeed on a claim under either ORS 95.230 or ORS 95.240, the plaintiff must show that a debtor made a transfer or incurred an obligation.

*See Dauven v. U.S. Bancorp.*, No. 3:13-CV-844-AC, 2014 WL 2949310, at *15 (D. Or. Mar. 19, 2014). Transfers include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes a payment of money, a release, a lease, and the creation of a lien or encumbrance." ORS 95.200(12). The plaintiff "has the burden of proving by a preponderance of the evidence that a fraudulent transfer of assets took place." *Preferred Funding, Inc. v. Jackson*, 185 Or. App. 693, 699 (2003)

      The Court finds that the financing statement submitted by Plaintiff in this case is insufficient evidence of a creation of a valid lien or encumbrance. An enforceable security interest requires authentication by the debtor and a security agreement providing a description of the collateral. ORS 79.0203(2)(c)(A). Here, the financing statement does not clearly evidence intent to create a security interest nor is it signed by the debtor. *See* ORS 79.0102(uuu) ("'Security Agreement' means an agreement that creates or provides for a security interest."); *id.* at (g) ("'Authenticate' means (A) To sign; or (B) with present intent to adopt or accept a record, to attach or logically associate with the record an electronic sound, symbol or process."). Plaintiff provided no other evidence to suggest that a security interest was actually granted to NDM in the assets of NDT or that an interest in the property was ever transferred. Instead, the testimony and evidence show that Wells Fargo Bank loaned NDM money, which was in turn provided to NDT to finance the TouchStar litigation. Defendant Rote, who had also personally guaranteed the loan to Wells Fargo, testified that the financing statement was a precautionary measure intended to protect Wells Fargo's interests and allow it to go after NDM's accounts receivable and subsidiary assets. The Court, therefore, finds that Plaintiff has not proven by a

preponderance of the evidence that the 2012 financing statement constitutes a transfer of assets as required by the statute.

### C.      95.230(1)(a)

Even assuming the filing of the financing statement constitutes a transfer of assets, Plaintiff has failed to show that the 2012 financing statement was an unlawful transfer in violation of ORS 95.230(1)(a). As described above, ORS 95.230(1)(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation with actual intent to hinder, delay, or defraud any creditor of the debtor.

Once again, this section requires "a case-by-case factual determination of whether a transfer was made" with such intent. *Morris*, 132 Or. App. at 221. The plaintiff can prove his case by showing certain "badges of fraud," described more fully in the preceding section, that allow the trier of fact to infer actual intent. *See* ORS § 95.2309(2); *Morris*, 132 Or. App. at 221.

Here, again, Plaintiff has demonstrated the existence of some of the badges of fraud. The financing statement was made to NDM, an insider under the statute. At the time the financing statement was executed, Plaintiff had already succeeded on his claims against NDT and had a judgment against Defendant for $75,375. Given the scope of the collateral covered by the financing statement, the alleged transfer constituted all or substantially all of the debtor's assets. And NDT was insolvent at the time the financing statement was filed because its liabilities combined with the judgment owed to Plaintiff outweighed its assets.

However, the Court finds that the evidence shows that it was more likely that not that Defendant's actual intent in this case was not to hinder, delay, or defraud any creditor of the debtor. Defendant testified that the purpose of the financing statement was to protect NDM and Wells Fargo while NDM was loaning money to NDT to finance the ongoing litigation against

TouchStar. Defendant testified that the two UCC financing statements—one from Wells Fargo and one from NDM—represented a stacking of obligations to assure Wells Fargo that NDM was being a good steward with the money it received from the line of credit. In other words, the evidence shows that the actual purpose of the financing statement was to protect the financial interest of a third-party bank while NDM, the parent company, was loaning NDT money sourced from that third-party. In light of this evidence, Plaintiff has not proven by a preponderance of the evidence that Defendant's actual intent in filing the 2012 financing statement was to defraud Plaintiff.

### D.     95.230(1)(b)

Plaintiff has also failed to show by a preponderance of the evidence that the 2012 financing statement violated ORS 95.230(1)(b). ORS 95.230(1)(b) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

Where evidence establishes the requirements of ORS 95.230(1)(b), a transfer "constitute[s] constructive fraud due to inadequate consideration . . . and the insolvency or near insolvency of the debtor." *Rapid Displays Inc. v. Gorder*, 155 Fed. Appx. 962, 966 (9th Cir. 2005). The statute defines "value" in § 95.220: "Value is given for a transfer or an obligation if in exchange for the transfer or obligation property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made . . ." *Id.* at (1). What constitutes

"reasonably equivalent" value is analyzed on a case-by-case basis. *See e.g. Norris v. R&T Mfg.,*

*LLC*, 265 Or. App. 672, 685 (2014) (affirming the trial court's determination that the defendant

did not pay "reasonably equivalent value" where the assets transferred exceeded the bank lien

that was also assumed); *Morris*, 132 Or. App. at 225–26 (finding that reasonably equivalent

value was given by the defendant to the debtor where a house was transferred in exchange for the

defendant's past services).

Plaintiff has not shown that NDT did not receive reasonably equivalent value in exchange

for the financing statement. Defendant Rote credibly testified that he prepared the financing

statement in order to protect NDM as it loaned money to NDT to finance the ongoing TouchStar

litigation. In the absence of any evidence as to the amount of money NDM loaned to NDT to

finance this litigation, the Court is unable to determine whether NDT received reasonably

equivalent value in exchange for any transfer of assets that may have occurred with the filing of

the May 29, 2012 UCC financing statement. Plaintiff has therefore failed to meet his burden on

this claim.

### E.      95.240(1)

Finally, Plaintiff has not proved by a preponderance of the evidence that the filing of the

financing statement violated ORS 95.240(1). Under ORS 95.240(1):

> A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor
> whose claim arose before the transfer was made or the obligation was incurred if
> the debtor made the transfer or incurred the obligation without receiving
> reasonably equivalent value in exchange for the transfer or obligation and the
> debtor was insolvent at the time or the debtor becomes insolvent as a result of the
> transfer or obligation.

Transfers that meet the requirements of ORS 95.240(1) "constitute[] constructive fraud due to

inadequate consideration for the property conveyed and the insolvency or near insolvency of the

debtor." *Doughty v. Birkholtz*, 156 Or. App. 89, 96 (1998).

Plaintiff has only established one of the requirements of ORS 95.240(1). In May of 2012, NDT was likely insolvent. Insolvency is defined in the statute as "at fair valuation, the sum of the debtor's debts is greater than all of the debtor's assets." ORS 95.210.  Though the figures on the balance sheet are not all stated at fair market value, NDT's assets outweighed its liabilities at the time of the transfer. The balance sheet demonstrates that NDT's assets amounted to $40,461 after the transfer, and its liabilities were $17,844. Adding these liabilities to the $75,375 owed to Plaintiff, it is more likely than not that NDT was insolvent at the time of the alleged transfer.

As described above, however, Plaintiff has failed to show that NDT did not receive reasonably equivalent value in exchange for the financing statement. Plaintiff has therefore also failed to meet his burden on this claim.

///

///

///

///

///

///

///

///

///

///

///

///

///

**CONCLUSION**

The Court finds in favor of Defendant Rote on all of Plaintiff's claims against him.

Because it would be inconsistent to enter a judgment in favor of Plaintiff on the same claims

against the remaining defaulted Defendants, the Court declines to do so. *See Garamendi v.*

*Henin*, 683 F.3d 1069, 1082–83 (9th Cir. 2012) ("[I]t would be incongruous and unfair to allow a

plaintiff to prevail against defaulting defendants on a legal theory rejected by a court with regard

to an answering defendant in the same action." (internal citations and quotations omitted)); *see*

*also In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001) ("It follows that if an action

against the answering defendants is decided in their favor, then the action should be dismissed

against both answering and defaulting defendants."). Judgment, therefore, shall be entered in

favor of Defendants on all claims.

Dated this _____25_____ day of ___JULY___ 2018.


_____
MARCO A. HERNÁNDEZ
United States District Judge